UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

John Anthony Castro

    v.       Civil No. 23-cv-531-SE
         Opinion No. 2024 DNH 002

New Hampshire Secretary of State,
David M. Scanlan, and Donald J. Trump

## ORDER

Plaintiff John Anthony Castro brings suit seeking an injunction barring the New Hampshire Secretary of State from counting any votes cast for former President Donald J. Trump in the 2024 New Hampshire Republican Presidential primary.[1] Castro's claim, both in this case and in a nearly identical case he filed in this court in September 2023 ("Castro I"), is premised on the theory that Trump is ineligible to hold the Office of President of the United States pursuant Section 3 of the Fourteenth Amendment of the U.S. Constitution. Castro alleges that, like Trump, he is a candidate in the New Hampshire Republican Presidential primary and that, therefore, Trump's inclusion on the Republican Presidential primary ballot injures him in the form of "a diminution of votes and/or fundraising."[2] Doc. no. 1, ¶ 32.

On October 27, 2023, the district court dismissed Castro I, determining after an evidentiary hearing that Castro lacked standing to bring his claim and that, even if he had

---

[1] As discussed further below, Castro initially sought additional injunctive relief in this case, including an order preventing the New Hampshire Secretary of State from placing Trump's name on the New Hampshire Republican Presidential primary ballot. At the evidentiary hearing to determine Castro's standing to bring his claim, Castro withdrew all of his requests for injunctive relief other than his request for an order preventing the Secretary of State from counting any votes cast for Trump in the Republican primary.

[2] Castro indicated during oral argument his intention to abandon his claimed injury relating to fundraising. January 3, 2024 Hearing Transcript (doc. no. 27) ("Tr.") at 150. Because his fundraising efforts are relevant to his status as a direct and current competitor of Trump in the New Hampshire Republican Presidential primary, the court will analyze those efforts.

standing, his claim raised a nonjusticiable political question. Castro v. New Hampshire Sec'y of State, No. 23-CV-416-JL, 2023 WL 7110390 (D.N.H. Oct. 27, 2023). The First Circuit Court of Appeals affirmed, agreeing with the district court that Castro lacked standing to pursue his claim, and declining to address whether the political question doctrine rendered Castro's claim nonjusticiable. Castro v. Scanlan, 86 F.4th 947 (1st Cir. 2023).

On December 1, 2023, ten days after the First Circuit issued its order, Castro filed the instant suit. His complaint asserts the same claim, names the same defendants, and originally sought comparable relief to that in Castro I. It included additional allegations regarding his campaign activity in New Hampshire and elsewhere, which Castro alleges establish standing. On December 11, Castro filed a motion for a temporary restraining order and a preliminary injunction. Doc. no. 4.

In light of the First Circuit's order affirming the dismissal of Castro I for lack of standing and after a status conference with the parties, the court scheduled an evidentiary hearing to address Castro's standing in this case. McCulloch v. Velez, 364 F.3d 1, 5 (1st Cir. 2004) (noting that "a federal court has an obligation to inquire sua sponte into its own subject matter jurisdiction"). The court held the hearing and heard argument on January 3, 2024. After considering the parties' filings, and the evidence and arguments presented at the January 3 hearing, the court finds that it lacks jurisdiction to consider Castro's request for injunctive relief. For similar reasons to those articulated by the district court and the First Circuit in Castro I, Castro has not established that he has or will suffer a political competitive injury arising from Trump's participation in the New Hampshire Republican Presidential primary. Castro's requested relief will also not redress his claimed injury of votes lost to Trump. Therefore, Castro lacks standing to bring his claim, and the court denies his motion for a preliminary injunction and dismisses the case.

Standard of Review

"[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation [in Article III] of federal-court jurisdiction to actual cases or controversies." Dantzler, Inc. v. Empresas Berríos Inventory and Operations, Inc., 958 F.3d 38, 46 (1st Cir. 2020) (quoting DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 341 (2006)). Federal courts "are obliged to assure ourselves of our jurisdiction under the federal Constitution before we may proceed to the merits." Perez-Kudzma v. United States, 940 F.3d 142, 144 (1st Cir. 2019). "For there to be a case or controversy under Article III, the [petitioner] must have a 'personal stake' in the case — in other words, standing." Town of Milton, Massachusetts v. Fed. Aviation Admin., 87 F.4th 91, 95 (1st Cir. 2023) (quoting TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021)).

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief. TransUnion, 594 U.S. at 423 (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–561 (1992)). The plaintiff bears the burden of establishing standing and "must demonstrate standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" Id. at 430 (quoting Lujan, 504 U.S. at 561). Because the court held an evidentiary hearing to assess Castro's standing, he must carry his burden by a preponderance of the evidence.[3] Castro, 2023 WL 7110390, at *3.

---

[3] Although Castro suggested otherwise in a motion in limine, doc. no. 21, he agreed at the hearing that, given the procedural posture of this case, he bears the burden to establish standing by a preponderance of the evidence. Tr. at 8.

3

Background

In light of the First Circuit's order affirming the district court's dismissal of Castro I, the facts Castro alleged in that case and the courts' reasoning in determining that Castro lacked standing to pursue his claim are particularly relevant here. Therefore, the court begins with a brief discussion of the proceedings in Castro I before turning to the new evidence and how it affects standing.

I. Castro I

When Castro filed his complaint in Castro I, he had not yet filed his declaration of candidacy for the New Hampshire Republican Presidential primary or paid his filing fee.[4] He asserted that he intended to do both on October 11, 2023, and he had done so when the district court held the evidentiary hearing on October 20. Trump had also declared his candidacy in the New Hampshire Republican Presidential primary and paid the filing fee prior to the evidentiary hearing.

Castro and the defendants stipulated in that case that, at the time of the evidentiary hearing, Castro's campaign had no serious prospect of winning any New Hampshire delegates to the Republican National Convention. Nor did it have a serious prospect of winning a significant number of votes or any campaign donations that otherwise would have gone to Trump. At the time of the evidentiary hearing, Castro's campaign had not advertised in New Hampshire or any other state, and Castro had not spoken to any New Hampshire voters about his candidacy. Castro agreed at the evidentiary hearing that "a primary goal of his candidacy is to establish the

---

[4] Potential candidates for the New Hampshire Republican Presidential primary ballot were not able to submit their declaration or pay their fee until October 11, 2023, after Castro filed his lawsuit in Castro I.

impermissibility of Trump's presidency, and that he has filed 27 lawsuits seeking to keep Trump's name off of the ballot in various states." Castro, 2023 WL 7110390, at *3.

Michael Dennehy, a political consultant and strategist, testified as an expert for Trump. He has served in a variety of positions in Republican politics, including as a committeeman for the Republican National Committee, Executive Director of the New Hampshire Republican Party, and a political director and campaign manager in several Republican political campaigns. Dennehy testified that Castro had no chance of winning a delegate in the New Hampshire Republican Presidential primary election. He explained that Castro did not appear in any public New Hampshire polls, had no advertisements, campaign office, or employees in New Hampshire, and had a campaign website that was "amateur" and "incomplete."

The district court determined that Castro lacked standing and dismissed his case. The court noted that Castro had invoked the theory of political competitor standing but had failed to prove injury-in-fact. Castro provided no evidence that any Trump supporter would support him if Trump were not listed on the primary ballot, and Dennehy testified that no Trump supporters would switch allegiance to Castro if Trump did not appear on the ballot. Therefore, the court determined that Castro's injury was speculative. The court found that "Castro is creating his own injury in order to manufacture standing to challenge Trump's eligibility to run for president," and that the law does not support the practice of manufacturing standing. Id.

Based on the foregoing, the court determined that "Castro is not competing and will not compete with Trump to win the New Hampshire primary, and for that reason, he is not a political competitor in the primary." Id. at *6. Therefore, Castro had not shown that he is suffering or would suffer an actual competitive injury if Trump's name is listed on the New Hampshire Republican Presidential primary ballot. The court added that Castro also failed to meet the traceability and redressability requirements for standing.

Castro appealed the district court's judgment to the First Circuit Court of Appeals. On November 21, 2023, the First Circuit affirmed, concluding that "although [Castro] is a registered political candidate for president, he has failed to show that he can satisfy what is known as the 'injury-in-fact' component of Article III standing." Castro, 86 F.4th at 949. It analyzed Castro's standing based on the facts that existed at the time that he filed his complaint. The court concluded that "the record from the evidentiary hearing reveals what is at most an overly speculative basis for finding that, as of the time of the filing of the complaint, Castro intended to do more than take steps that would enable him to qualify as an 'officially recognized' write-in candidate." Id. at 957. It determined that this evidence was insufficient to establish that Castro was Trump's "current and director competitor" and that, therefore, he had not satisfied the injury-in-fact component of the standing inquiry. Id. at 959. As discussed further below, the First Circuit also concluded that Castro's placement on the ballot would not "suffice in and of itself to show a competitive injury with the requisite degree of concreteness and particularity." Id. at 959-60.

II.     Castro's Instant Suit

On December 1, 2023, Castro filed this lawsuit, and ten days later, he filed a motion for a temporary restraining order and preliminary injunction. After a status conference in which Castro withdrew his request for a temporary restraining order, the court scheduled an evidentiary hearing for December 21, 2023 to address the issue of Castro's standing to pursue his claim.[5]

---

[5] Mindful of the district court's order dismissing Castro's claim in Castro I and the First Circuit's order affirming the judgment, the court ordered Castro to file a "brief delineating the evidentiary distinction between this case and his prior case in this court against the same defendants" and addressing "how those distinctions affect the standing analysis contained in" the prior orders. Doc. no. 8 at 1. Castro filed his brief before the evidentiary hearing.

6

That hearing was rescheduled to January 3, 2024 at the request of the parties in order to accommodate Castro's witnesses. At the January 3 hearing, the parties agreed that the court would not consider Castro's verified pleadings as evidence in support of standing, but rather the court would consider only evidence presented at the hearing.

### A.     Campaign Activity in New Hampshire

Castro introduced evidence that he had secured his placement on the 2024 New Hampshire Republican Presidential primary ballot.[6] Tr. at 34. He also called two campaign volunteers as witnesses: David Obed Garza, Castro's executive assistant at his tax advisory firm and his brother-in-law, and Alexander Dominic Gomez, Castro's employee and his wife's cousin. Garza and Gomez testified that they flew from Texas to New Hampshire on October 26, 2023, at Castro's direction, to put up lawn signs for Castro's campaign. Tr. at 21. They brought 18 campaign signs on the trip. Tr. at 43. On October 27, Garza and Gomez drove to Nashua, New Hampshire to place some of the signs. Tr. at 22. They each approached five or six homes to ask if the residents would allow them to put Castro campaign signs in their yards. Tr. at 41. All of them declined. Id. Garza and Gomez did not know anything about the residents of the houses they visited, including whether the inhabitants were registered Republicans or if they intended to vote in the 2024 New Hampshire Republican Presidential primary election. Tr. at 42.

Garza and Gomez then drove through Manchester and Concord, New Hampshire and put up roughly 12-15 signs in public areas; because they were unable to place all of the signs, they brought some back to Texas with them. Tr. at 42-43. Castro instructed them by phone to take pictures of the signs "as evidence" and to look for potential billboard space. Tr. at 23. They

---

[6] Castro introduced evidence that he had also secured his placement on the 2024 Republican Presidential primary ballots for Arizona and Nevada. Tr. at 32, 35.

7

subsequently drove around for roughly an hour and a half and located ten billboards. <u>Id.</u> At this point, approximately 4:00 p.m. on October 27, Garza and Gomez ended their campaign activity in New Hampshire. Tr. at 24. They relaxed for the remainder of the evening and flew back to Texas the following morning. <u>Id.</u> Other than the Nashua residents, they did not speak to anyone about Castro's candidacy. Tr. at 43. In total, the trip cost roughly $3,500, and Castro personally paid for all expenses. Tr. at 44.

      Castro admitted that he has not peformed "traditional campaign activities" in the state. Tr. at 61. He has no campaign office or local volunteers, and he has not obtained a list of New Hampshire Republican voters to target. Tr. at 61-62. Further, he has not participated in any campaign or political events, such as town halls or rallies, and he did not attend the Lesser-Known Candidate Forum. Tr. at 61, 117. Castro testified that when he came to the state to register for the primary ballot, he spoke to seven or eight people to introduce himself as a candidate while he was out having breakfast. Tr. at 59. Three of them identified themselves as Republicans. Tr. at 60. During his trip to the state for the October 20 hearing in <u>Castro I</u>, he went to the mall to buy his daughter a gift and spoke to about four people to learn more about the area. <u>Id.</u>

      Castro also testified that he has spoken to hundreds of voters who suggested that they would vote for him if Trump were not on the ballot. Tr. at 77. He stated that he encountered the majority, if not all, of these voters in Texas during his candidacy for Congress in 2021. Tr. at 82. His testimony was unclear as to whether his discussions with the handful of New Hampshire voters touched on this issue. Tr. at 83. Castro noted, however, that to the extent that he spoke to any Trump voters after he began his legal campaign to disqualify Trump, he did not inform any of those voters that he was actively litigating that issue. He said he "tried keeping those activities

8

very quiet and not letting them know of that" because Trump voters are "probably going to hate [him] at that point." Tr. at 84.

As in the evidentiary hearing in Castro I, Trump called Dennehy to testify. Dennehy's testimony concerning the prospects of Castro's campaign was consistent with his testimony in Castro I with some exceptions. Dennehy stated that his opinion in Castro I was that it was "next to impossible" for Castro to win one or more delegates in the New Hampshire Republican primary. Tr. at 111. He testified that, after considering the evidence Castro offered at the January 3 hearing, his opinion was now that it was impossible for Castro to win a delegate in the New Hampshire Republican primary. Tr. at 112. Dennehy specifically based his opinion on the fact that Castro had no campaign "infrastructure" in New Hampshire, and that the minimal campaign activity that Castro had funded, namely the placing of 12-15 signs in Nashua, was competitively meaningless. Tr. at 114-16. Dennehy testified that a competitive presidential primary campaign would need to place 10,000 to 20,000 signs throughout New Hampshire, in addition to other campaign activities. Tr. at 116.

    B.    Other Campaign Activity

Garza and Gomez also traveled to Phoenix, Arizona to campaign for Castro on November 1, 2023. Tr. at 25. They flew to Phoenix from Texas that morning and picked up 50 campaign signs that they had ordered from an Arizona company. Tr. at 26. The following day, they set out with a goal of placing 30 signs, but they had difficulty doing so because of the dry ground. Tr. at 27. They ultimately put up between five and ten signs before returning to the airport and catching a return flight to Texas at approximately 6:00 p.m. Id. Castro also introduced evidence that he purchased a digital campaign billboard in Arizona. Tr. at 28.

In addition to the witness testimony about on-the-ground campaigning, Castro testified that he has campaigned on social media, including by posting videos about his nationwide legal campaign. Tr. at 70-71, 73. He could not identify any video that he had posted since the date of the evidentiary hearing in Castro I, however.[7] Id. He testified that the videos that he has posted thus far did not target New Hampshire voters and he had no way of knowing if any New Hampshire voter had viewed them. Tr. at 73. He added that his campaign had created, though not yet released, a 30-second campaign video that was specifically intended to target New Hampshire residents, albeit not registered voters or Republicans. Id. He also testified that he had reached out to polling companies to try to be included in Republican Presidential Primary polls but was been unsuccessful. Tr. at 90.

Castro also maintains that the nationwide media interest in him constitutes campaign activity, even while acknowledging that the "vast majority" of the media requests he has received concern his lawsuits. Tr. at 68, 87. He testified that only two reporters, one in New Mexico and another in an unknown state, "wanted to know more details about [his] campaign positions." Tr. at 87. There is no evidence that the media has covered his candidacy, rather than his legal campaign, in New Hampshire.

In addition, since the evidentiary hearing in Castro I, Castro's campaign received two "unsolicited" contributions totaling $126.24. Tr. at 54. He has not received any campaign contributions from a New Hampshire resident. Tr. at 56, doc. no. 25 at 29.

---

[7] Castro testified that he had posted a video on X, formerly Twitter, of a show he produced called "The Truth Addict." Tr. at 70. He conceded, however, that he had posted the episode in September 2023, prior to the evidentiary hearing in Castro I. Moreover, the episode was about Section 3 of the Fourteenth Amendment and not about Castro's presidential campaign. Tr. at 72.

C.   Relief Sought

Castro's complaint seeks four forms of injunctive relief:

> 18. Plaintiff John Anthony Castro asks this Court to issue an injunction preventing Defendant Secretary of State from accepting and/or processing Defendant Donald John Trump's ballot access documentation, including, but not limited to nominating papers and nominating petitions.
>
> 19. Plaintiff John Anthony Castro asks this Court to issue an injunction preventing Defendant Secretary of State from printing ballots containing Defendant Donald John Trump's name.
>
> 20. If the Court rules in Plaintiff John Anthony Castro's favor but the state has already printed state election ballots. Plaintiff John Anthony Castro asks this Court to order the ballots be re-printed with Defendant Donald John Trump's name removed from the ballot.
>
> 21. If the Court determines that re-printing of the state election ballots is impractical, Plaintiff John Anthony Castro asks this Court to issue an injunction preventing Defendant Secretary of State from counting any votes (ballot or Write-in) in favor of Defendant Donald John Trump.

Doc. no. 1, ¶¶ 18-21. At the evidentiary hearing, the Secretary of State argued that Castro's first three requests for injunctive relief are moot. Tr. at 141. First, the Secretary of State had already accepted Trump's ballot documentation prior to Castro filing this lawsuit. In addition, ballots containing Trump's name had already been printed and sent to Military and Overseas voters in accordance with state law, see RSA § 657:19, as well as to other absentee voters who requested a ballot. Finally, the Secretary of State represented that there was insufficient time to reprint Republican Presidential primary ballots without Trump's name before the scheduled January 23, 2024 primary date.

Castro agreed with the Secretary of State's arguments as to the mootness of his first three requests for injunctive relief, and he withdrew those requests at the hearing. Tr. at 138-41. Thus, Castro's only remaining request for injunctive relief is an order preventing the Secretary of State

11

from counting any votes cast in favor of Trump in the New Hampshire Republican Presidential primary election.

## Discussion

As he did in Castro I and in similar lawsuits in other states, Castro invokes the theory of political competitor standing, which requires him to show that he is "a direct and current competitor" of Trump in the 2024 New Hampshire Republican Presidential primary. Castro, 86 F.4th at 956. Neither the United States Supreme Court nor the First Circuit has expressly recognized the political competitor theory of standing, though prior First Circuit decisions provide guidance for the court's analysis. Id. at 954. Political competitor standing is analogous to the accepted theory of economic competitor standing, but the difference between the political and economic realms requires a more exacting definition of "direct and current competitor" so that courts do not "entertain[] a suit based on what is, in effect, a generalized concern that a particular individual is not lawfully entitled to run for office." Id. at 956. Applying this standard, the First Circuit concluded in Castro I that Castro failed to meet his burden because he had not shown "a 'plausible' chance of being competitively affected" by Trump's inclusion on the 2024 Republican Presidential primary ballot in New Hampshire. Id. at 959 (quoting Becker v. Fed. Election Comm'n, 230 F.3d 381, 386 n.4 (1st Cir. 2000)).

Castro argues that he has made such a showing in this case. He notes that the First Circuit's order in Castro I focused on the fact that he did not allege in his complaint that he was on the ballot in the 2024 New Hampshire Republican Presidential primary. Here, he both alleged and submitted evidence that his name has been placed on the ballot. In addition, Castro referred to the testimony of his two campaign volunteers, offering their trip to New Hampshire in October 2023 to put up signs as evidence of his campaign activity in the state. He argued that this

12

conduct, along with his amorphous social media campaign activity, which is admittedly focused entirely on his challenges to Trump's candidacy, suffices to carry his burden to show that he has standing as a political competitor. He is wrong.

As was fatal to his competitor standing argument in Castro I, "Castro makes no attempt to demonstrate that he is actually competing with Trump for votes and contributions." Castro, 2023 WL 7110390, at *5. Other than a small handful of individuals (only three of whom specifically identified themselves as Republicans), Castro did not speak with any potential Republican primary voters in New Hampshire, let alone Trump voters specifically. He conceded that he had received no campaign contributions from anyone in New Hampshire,[8] and he offered no evidence to show that he will benefit from any voter or contributor defections from Trump to himself. In contrast, Dennehy testified that there is no evidence that Castro has any name recognition in New Hampshire, Castro is not competing for votes with Trump, and he has no chance of winning a delegate in the New Hampshire Republican Presidential primary. Notably, Castro agreed that he will not win a single delegate, even if the court enjoins the Secretary of State from counting votes for Trump. Tr. at 142.

Castro, however, believes that he has carried his burden to establish competitor standing because he has "competed for a single vote" and "shown at least one overt competitive act." Tr. at 134. Even assuming without deciding that Castro's actions met that threshold, that is not the test for competitor standing. Castro elicited expert testimony that nobody listed on the Republican Presidential Primary ballot ever receives zero votes. Tr. at 121. Thus, if competing for a single vote were sufficient, anyone listed on the ballot would have political competitor standing. The First Circuit has been careful "not to adopt a rule that would grant standing to any

---

[8] Castro also testified that he has not solicited any campaign contributions. Tr. at 53-54.

political entrant to challenge any aspect of an election that might <u>someday</u> affect them . . . and []
therefore require[s] the candidate to show a plausible chance of being competitively affected by
the conditions that they challenge[]. Castro, 86 F.4th at 958-59 (quotations, citation, and
alteration omitted). As a result, nominal placement on the ballot is insufficient to confer
standing. Id. at 959-60. Instead, Castro must show that he is "actually a putative rival's
competitor for votes or contributions." Id. at 960.

      Castro makes no such showing here. Indeed, he does not argue that his minimal campaign activities – sending two campaign volunteers to New Hampshire with 18 campaign signs for a few hours of activity – were intended to help him compete with Trump for votes or contributions. Instead, he conceded at oral argument that his efforts were prompted by "an overemphasis on wanting to see substantive boots on the ground activities" by the courts considering his cases. Tr. at 134-35. He further explained that his motivation "was just like okay, well, if people want to see a couple of yard signs then [he'd] be happy to demonstrate that there's support out there." Tr. at 134. In other words, Castro admits that his campaign activity in New Hampshire was intended solely to establish his federal court standing. Castro somewhat contradicted himself as to the purpose of sending his two campaign volunteers to New Hampshire when he testified that the "purpose of the trip was to get my name out there, put campaign signs in New Hampshire so people can start developing that name recognition . . . ." Id. In light of the evidence as a whole, including his other testimony regarding the purpose of that limited campaign activity, the court does not find Castro's statement credible.

      Additional evidence that Castro offered at the hearing further underscored that his campaign activity was not designed to compete with Trump for primary voters. Castro offered as an exhibit an email he sent to Suffolk University on October 30, 2023, purportedly seeking to be added to the University's Republican Presidential primary poll. Doc. no. 25 at 12-13. In that

14

email, Castro admits that his aim was to aid his legal challenges. Id. at 13 ("I'm only sending this email to prove to the Court that I reached out to request inclusion and was ignored since the polling system is a rigged pay-to-play system.").

As the First Circuit made clear, a plaintiff lacks political competitor standing when his campaign activity related to an upcoming election amounts to "the pursuit of the legal challenge itself" and the record shows "scant indication that any foreseeable future activity by the plaintiff in relation to that race would amount to anything more than the further pursuit of that legal challenge." Castro, 86 F.4th at 959. That is precisely the conclusion dictated by Castro's evidence in this case.

The court notes that Castro maintained throughout his testimony that he is a legitimate and plausible candidate for the 2024 New Hampshire Republican Presidential primary. He testified that he believes that his campaign uses "social media and technology to reach thousands of people rather than one-to-one." Tr. at 134. But there are several problems with that argument, most notably that Castro offered no evidence that he has actually campaigned for the New Hampshire Republican Primary through social media since the date of the evidentiary hearing in Castro I. His existing social media posts, by his own testimony, relate solely to his legal campaign against Trump and not to his political campaign for the presidency. In fact, the only mass social media "campaigning" about which Castro testified was the episode of "The Truth Addict," which he posted to X.com in September 2023, before the evidentiary hearing in Castro I, and which focuses on Section 3 of the Fourteenth Amendment. Although Castro suggested that he has also interacted directly with voters through social media, he offered no details regarding those communications or how they demonstrate his competitive standing as a candidate in the

15

New Hampshire Republican Presidential primary race.[9] Equally as important, Castro conceded that his social media campaign activity, to the extent that it existed at all, had not yet been directed toward New Hampshire voters, and he had no idea whether any New Hampshire voters had seen it. Tr. at 77-78.

In sum, the evidence adduced at the January 3 hearing demonstrates that Castro has not conducted his campaign activity with the intention of being a direct and current competitor with Trump for votes or contributions. The evidence further shows that Castro has no plausible chance of being competitively affected by Trump's inclusion on the 2024 New Hampshire Republican Presidential primary ballot. For these reasons, Castro has not shown that he is suffering or would suffer an actual, competitive injury if the Secretary of State counts votes cast for Trump.[10]

While that ends the matter, the court notes that in addition to failing to carry his burden to demonstrate injury, Castro also lacks standing because he has not shown that his injury is redressed by his requested relief. The redressability element of standing requires proof that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan, 504 U.S. at 561 (1992); accord Dep't of Educ. v. Brown, 600 U.S. 551, 561 (2023).

---

[9] The only evidence that Castro communicated with a potential New Hampshire voter through electronic means was an unsolicited email he received on October 4, 2023, offering him legal advice regarding his court case in "my home state of New Hampshire." Doc. no. 25 at 14. Castro testified that he does not know whether the emailer currently resides in New Hampshire, is a registered voter and a Republican, or has any knowledge of Castro's campaign. Tr. at 57-58.

[10] Although the matter needs little discussion at this point, the court agrees with the several other courts that have considered Castro's claim that the defendants are entitled to dismissal because Castro's campaign efforts have been merely an effort to manufacture standing, which is not supported by law. Castro v. Aguilar, et al., No. 223CV01387GMNBNW, 2024 WL 81388, at *2 (D. Nev. Jan. 8, 2024); Castro v. Fontes, et al., No. CV-23-01865-PHX-DLR, 2023 WL 8436435, at *6 (D. Ariz. Dec. 5, 2023); Castro, 2023 WL 7110390, at *5.

As discussed above, at the evidentiary hearing, Castro withdrew all of his requests for injunctive relief other than for an order preventing the Secretary of State from counting any votes cast in favor of Trump in the New Hampshire Republican Presidential primary election. Castro's alleged injury is the loss of votes for him caused by Trump's presence on the ballot. That claimed injury could not be redressed by a favorable decision because, once the voting occurs, Castro cannot recoup any votes he purportedly lost to Trump. To the extent that Castro intended to argue that excluding Trump would increase his proportional share of the primary vote, that could only redress an injury if proportional share affected Castro's political outcome by awarding him delegates. However, Castro conceded at the hearing that he would not win any delegates even if the Secretary of State were prevented from counting votes in Trump's favor. Tr. at 142. Castro has not proven redressability.

## Conclusion

For the reasons stated above, Castro's motion for a preliminary injunction (doc. no. 4) is denied. All other pending motions are denied as moot, and the case is dismissed. The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
Samantha D. Elliott
United States District Judge

January 19, 2024

cc:   John Anthony Castro, pro se
      Counsel of Record